**FORRESTER & WORTH, PLLC**
3636 NORTH CENTRAL AVENUE, SUITE 700
PHOENIX, ARIZONA 85012-1927
TELEPHONE (602) 271-4250
FACSIMILE (602) 271-4300
S. CARY FORRESTER (006342)
E-MAIL SCF@FWLAWAZ.COM

ATTORNEYS FOR THE DEBTOR

# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| In re: | Chapter 11 |
| NUTRACEA, a California corporation, | 2:09-bk-28817-CGC |
| Debtor. | **DECLARATION OF W. JOHN SHORT IN SUPPORT OF DEBTOR'S MOTION FOR AUTHORITY TO (1) SELL ASSETS AND ASSIGN PURCHASE ORDERS ASSOCIATED WITH INFANT CEREAL BUSINESS FREE AND CLEAR OF LIENS (2) ENTER INTO TOLL PROCESSING AGREEMENT AND (3) PAY FINDER'S FEE** |
| | Hearing Date: March 1, 2010
Hearing Time: 1:30 p.m.
Hearing Room: 601 |

W. John Short hereby states under penalty of perjury as follows:

1. I am Debtor's Chief Executive Officer and President.

2. I file this Declaration in support of <u>Debtor's Motion for Authority to (1) Sell Assets and Assign Purchase Orders Associated with Infant Cereal Business Free and Clear of Liens (2) Enter into Toll Processing Agreement and (3) Pay Finder's Fee</u>, filed on February 11, 2010 (the "**Motion**"). (Dkt. No. 239)

Declaration in Support of Kerry Sale

3. Debtor is a publicly traded health-science company that develops and distributes stabilized rice bran and proprietary rice bran formulations, including infant cereal for the private label market.

4. Debtor grossed approximately $2.2 million dollars from the manufacture and sale of infant cereal products in 2009, and has projected its sales in 2010 at approximately $5 million. However, its net profit margins are relatively small and it has, historically, operated at or near the break-even level. Debtor also faces competition from much larger and better funded competitors.

5. The infant cereal business is not part of Debtor's core business, which involves the manufacturing, development, and marketing of a variety of products using stabilized rice bran and rice bran formulations. The infant cereal business does not involve the use of Debtor's proprietary technology, patents or trade secrets.

6. Debtor's manufacturing facility in Phoenix, Arizona was constructed for the production of infant cereal products. It is currently idle, and Debtor is producing all of its infant cereal products at its facility in Dillon, Montana. The real property and improvements associated with the Phoenix facility are owned by Debtor's wholly-owned subsidiary, NutraPhoenix, L.L.C., but the equipment, machinery and other assets that are the subject of the Motion are owned by Debtor.

7. Because of the need to monetize non-core assets early in the case, in order to meet its budgeted cash requirements, Debtor aggressively pursued a potential sale of its infant cereal business by, among other things, using its contacts to identify others in the infant cereal business that might have an interest in purchasing it.

8. Debtor initiated discussions with those it identified as possible purchasers, including a Chicago-based private equity firm, a large publically traded European food company, a large privately owned Chinese food company, a large publically traded

Chinese food company and a mid-sized U.S. food company. Of those contacted, only Kerry, Inc. ("**Kerry**") made an offer to purchase the infant cereal business.

9. On or about February 11, 2010, Debtor and Kerry entered into an agreement (the "**Agreement**") for the sale of (i) Debtor's infant cereal business; (ii) the equipment, machinery and related assets intended for use in that business, located primarily in Debtor's Phoenix, Arizona facility; (iii) the infant cereal inventory located at its Dillon, Montana facility; (iv) certain related customer and supplier lists; and, (v) a limited amount of intellectual property, all as more fully described in Sections 2.1 and 2.2 of the Agreement (collectively the "**Assets**"). A copy of the Agreement is attached to the Motion as Exhibit "A".

10. The Agreement also calls for the assignment of all purchase orders relating to Debtor's infant cereal business in existence at the closing, with two exceptions set forth in the Agreement (the "**Assigned Contracts**" and, collectively with the Assets, the "**Purchased Assets**"). Kerry has agreed to timely perform all obligations arising under the Assigned Contracts from and after the Closing. The face amount of the Assigned Contracts is $213,347.77, but is subject to change prior to the close of escrow. All of the Assigned Contracts were generated after the bankruptcy filing. Debtor is unaware of any defaults under the Assigned Contracts or any prohibitions on their assignment to Kerry.

11. The Agreement calls for the sale and assignment of the Purchased Assets for the cash purchase price of $3,900,000. Kerry has deposited $250,000 into an escrow at Security Title, and the balance is to be paid at the close of escrow.

12. Kerry will pay an additional amount for Debtor's infant cereal inventory, valued at Debtor's cost, as determined by a physical inspection to be conducted approximately four days before the close of escrow. Based upon its ordinary inventory levels, Debtor estimates the additional amount to be paid at approximately $200,000.

13. As part of the Agreement, and because it will take months for Kerry to move the purchased machinery and equipment, install them in its own facility, and make them operational, Debtor has agreed to produce infant cereal for Kerry in accordance with the terms of the Toll Processing Agreement, a copy of which is attached to the Agreement as Exhibit "B". Debtor estimates that this will produce net revenue of approximately $800,000.

14. The infant cereal will be produced from raw material provided by Kerry, according to Kerry's specifications, and Debtor will neither own nor sell it.

15. It is essential that the sale of the Purchased Assets be completed by no later than March 15, 2010 in order to meet Debtor's critical cash requirements. This critical need for cash is reflected in the cash flow projections prepared by Debtor's financial advisors at the outset of this case and in the weekly cash flow projections prepared for Wells Fargo Bank, N.A., the DIP lender. The sale is also necessary to insure compliance with the financial covenants set forth in the DIP financing agreement.

16. Debtor has obtained appropriate authorization from its board to enter into the Agreement and perform thereunder and, upon entry of the court order approving the sale, will have full power and authority to do so.

17. The Purchased Assets are subject to a senior security interest in favor of Wells Fargo Bank. The security interest secures all of Debtor's obligations under its DIP credit facility. The amount presently owing on the DIP credit facility is approximately $4.5 million.

18. There are no other known liens against the Purchased Assets. However, eight subcontractors and materialmen have sued NutraPhoenix in the Superior Court of Arizona to foreclose mechanics' and materialmen's liens relating to the construction of the Phoenix facility and the installation of the machinery and equipment. These claimants

have been given notice of the proposed sale and, to the extent that any of them assert that their liens attach to the Purchased Assets, Debtor disputes such claims.

19. Wells Fargo has consented to the sale and assignment of the Purchased Assets and has agreed that it will release its security interest in those items in return for payment of approximately $1,430,000 from the sale proceeds. That amount will be applied against the DIP term loan facility. Upon closing, the balance owing under the DIP revolving credit facility (approximately $1 million) will be paid off, but the amount paid, minus approximately $100,000 to reflect a reduction in borrowing base, will then be immediately available to Debtor under the DIP revolving credit facility.

20. Debtor was introduced to Kerry by an unrelated third party, Drum Drying Resources, LLC ("**DDR**"), in early November of 2009, near the time that this case was filed. Debtor and Kerry had no previous contact concerning the Purchased Assets.

21. After the introduction, Debtor provided Kerry with information concerning the Purchased Assets, discussed the structure of a proposed sale, and exchanged purchase offers and counteroffers. Beginning in late December, Debtor and Kerry began exchanging drafts of the Agreement and related documents.

22. Throughout the process of negotiating the Agreement and the related Toll Processing Agreement, Debtor and Kerry were represented by their own counsel. All negotiations were at arms length, without collusion.

23. To the best of my knowledge, information and belief: (a) Kerry is not an insider of Debtor; (b) Kerry is not related to the Debtor in any way; (c) Kerry has no connection with any of Debtor's officers or directors; (d) the proposed sale is an arms-length transaction; and, (e) no fraud, collusion or improper relationship exists between Debtor and Kerry.

24. The machinery and equipment located in Debtor's Phoenix, Arizona facility were appraised on September 10, 2009, by Don Tyson, senior appraiser for Rabin Worldwide. The appraisal was prepared for Wells Fargo. Mr. Tyson placed the forced liquidation value of the machinery and equipment at $916,250 and the orderly liquidation value at $1,267,650.

25. Debtor provided counsel with the names and addresses of all parties known or believed by it to have an interest in the Purchased Assets and all parties to the Assigned Contracts, and it is my understanding that counsel provided notice of the proposed sale to all such parties.

26. I believe that the consideration to be paid by Kerry under the Agreement is the highest attainable under the circumstances. The sale will allow a significant reduction in the secured debt to Wells Fargo, leave Debtor with approximately $2.2 in cash availability and satisfy the budgeted goal for asset sale proceeds through May of 2010. It will also make a default under the DIP credit facility unlikely.

27. In addition, Debtor has been advised that its Phoenix facility will be more readily marketable after the specialized machinery and equipment is removed. NutraPhoenix recently listed that property at $6.9 million.

28. Debtor entered into a prepetition finder's fee agreement with DDR, pursuant to which it agreed to pay DDR up to $450,000, provided that one or more of the specified transactions was consummated. The sale to Kerry is a hybrid and does not fall neatly within the list of specified transactions. Accordingly, in late December the parties renegotiated the finder's fee and Debtor agreed to pay DDR $200,000 upon the close of the sale to Kerry. I believe that DDR provided a valuable service to the estate and that, without its efforts, a timely sale of the Purchased Assets would not have been possible.

1  I declare under penalty of perjury that the foregoing is true and correct to the best
2  of my knowledge, information and belief.

*(signature)*
W. John Short